## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW YORK

| | |
|---|---|
| XIAOHONG (A/K/A "SOPHIE") QI, AND HARMONIA HOLDINGS LTD.<br><br>    Plaintiffs,<br><br>v.<br><br>KENNETH DINGLEDINE, YEBO (A/K/A "BORIS") CAO, BARBARA DARWALL, ROYO HOLDINGS LTD, HARMONIA HOLDINGS UK LTD., BBK THEATRICALS LTD, JOHN DOES 1 through 10 and ABC COMPANIES 1 through 10.<br><br>    Defendants. | Civil Action No. _____<br><br><br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs XIAOHONG (A/K/A SOPHIE) QI ("Qi" or "Sophie"), AND HARMONIA

HOLDINGS LTD. ("Harmonia" and collectively with Qi referred to as "Plaintiffs") complaining

of Defendants KENNETH DINGLEDINE ("Dingledine"), YEBO (A/K/A BORIS) CAO

("Cao"), BARBARA DARWALL ("Darwall"), ROYO HOLDINGS LTD ("Royo"),

HARMONIA HOLDINGS UK LTD. ( referred to as "Fake Harmonia") and BBK

THEATRICALS LTD. ("BBK") (collectively BBK, Dingledine, Cao, Darwall, Royo, and Fake

Harmonia are referred to as "Defendants") allege, as follows:

### SUMMARY OF THE ACTION

1.     Plaintiffs bring this action for monetary and injunctive relief against Defendants,

seeking to remedy Defendants' violations of law, fraud, conversion, breach of contract, tortious

interference, theft of trade secrets, trademark infringement, and unjust enrichment, all stemming

from Defendants' purposeful and knowing scheme to divert business away from Plaintiffs through

the creation of competing business entities, which brazenly operated under the "Harmonia" trade name without authorization, and were designed to confuse and deceive the theatrical community into believing that that they were working with Plaintiffs, when, if fact, Defendants' stole Harmonia's assets and identity in order to produce theatrical performances for their own enrichment, and at the expense of Plaintiffs.

2.      As more fully set forth herein, Harmonia is a company which was founded by Sophie Qi, who is also the chief executive officer and sole shareholder of Harmonia.  Ms. Qi has spent over a decade growing her business, and has become a renowned and successful producer of big budget Broadway-style musicals and performances which have been, and currently are performing on Broadway and touring throughout the United States, London's West End, the People's Republic of China, Taiwan and elsewhere. Harmonia also presents its productions to investors and potential investors and licenses its intellectual property worldwide.  Through her affiliate, Harmonia Theatrical Licensing LLC, Qi also controls a vast catalog of rights to shows that are licensed to theatrical touring companies and educational institutions around the world.

3.      Under Ms. Qi's tutelage, Harmonia has developed and attracted investors who span the globe from the United States to China and beyond.  She has developed a network of directors, actors, stage craftsman and others who she can draw upon to create, produce, exhibit and tour such shows. She has developed investment platforms for her investors and a methodology for pricing and producing such shows in the United States and internationally.  Sophie and Harmonia have built a recognizable brand which has created and produced such shows as *Moulin Rouge! The Musical* (winner of 10 Tony Awards including Best Musical), *Dear Evan Hansen* (winner of 6 Tony Awards), *Jagged Little Pill* (winner of 2 Tony Awards), *Titanic the Musical*, *King Kong the Musical*, *9 to 5 the Musical*, and *Jersey Boys*.

4.      Ms. Qi took Defendants Dingledine and Cao under her wing and hired them for managerial roles to further develop and expand Harmonia, for which they were handsomely paid. Qi introduced them to Harmonia's stable of theater investors, creative artists and theatrical craftsman, as well as Harmonia's method of developing, investing in and producing shows and as a result, Dingledine and Cao became integral parts of Harmonia's team and business operations. Dingledine and Cao possess highly confidential information about past, current and future productions in development by Harmonia. In addition, and as relevant to this action, as employees, officers and/or managers of Harmonia, Dingledine and Cao owe fiduciary duties to faithfully operate the business that Qi created from the ground up.

5.      Unfortunately, in return for Ms. Qi's generosity and largess garnered upon them, Dingledine and Cao, for over at least the last approximately 18 months, have conspired to fraudulently divert business from Plaintiffs to secret entities they created in various countries (together with the non-employee Defendant, Darwall, and John Does 1 through 10 and ABC Companies 1 through 10) for the specific purpose of siphoning off business and income using Harmonia's name, good will, valuable intellectual property and valuable and sensitive proprietary information, and assets.

6.      Defendants have unfairly infringed on Harmonia's trademark by creating and working for companies that brazenly misappropriated Harmonia's name without authorization, to intentionally confuse investors, artists and business partners in order to unfairly and illegally compete with Harmonia.

7.      Worse still, Defendants funded their scheme using Harmonia's financial, administrative and intellectual resources, in breach of Defendant Dingledine and Cao's contractual and fiduciary duties.

8.    Defendants' actionable conduct includes, among other things:

- Defendants Dingledine and Cao conspiring with Defendant Royo and others identified herein as John Does and ABC Companies, to create the unauthorized entity, Defendant Harmonia Holdings UK Limited ("Fake Harmonia"), for the purpose of producing theatrical performances in Europe and Asia, including but not limited to unauthorized productions *Titanic the Musical, Disney Gala 2022, The Last Five Years, Sanxingdui, Peter Rabbit the Musical, Spring Awakening,* and *The Very Hungry Caterpillar* (and most certainly others) by misappropriating the Harmonia trade name, intellectual property, industry contacts and proprietary trade secrets without authorization from Plaintiffs, and for which Dingledine is identified as the "Manager" on various service contracts for the production of theatrical performances, and Defendant Royo's bank account information is used to collect proceeds from various productions produced by Fake Harmonia;

- Upon information and belief, Defendant Cao created an entity called Shanghai Theatrical Dreams Cultural Communication Ltd. ("Shanghai Cultural Communication") on or about March 2023 and organized under the laws of China, for the purpose of competing with Plaintiffs by producing theatrical performances in Asia by intentionally misleading investors, artists, and theatrical craftsmen into believing that they were doing business with Ms. Qi's affiliate Shanghai Theatrical Cultural Development Ltd, ("Shanghai Cultural Development") an entity organized under the laws of China that Ms. Qi wholly owns and created in 2018 to produce theatrical productions in China. In Chinese, these two companies share almost identical names, especially their short names, which are both written as 剧梦 which

translates to "theatrical dreams", making the two companies difficult to distinguish. Defendants' intention was to mislead investors, business partners, collaborators, consumers and theater industry personnel as to the source of the good and services and to steal Plaintiffs' intellectual property;

- Defendants Dingledine and Darwall formed the entity "BBK Theatricals Ltd." (where, upon information and belief, "BBK" stands for "Barbara, Boris and Ken") to produce theatrical productions in Europe and Asia and further divert business from Plaintiffs in breach of Dingledine, Darwall and Cao's fiduciary duties to Harmonia;

- Defendants Dingledine and Cao perpetrated their scheme of diverting business opportunities and profits away from Harmonia by using Harmonia's bank accounts and Plaintiff Qi's investment therein, to fund their production expenses, travel and personal expenses, for productions that they were, in fact, producing for Fake Harmonia and other entities unaffiliated with and unauthorized by the real Harmonia and Ms. Qi;

- Upon information and belief, Defendants Dingledine, Cao, Darwall, and Royo together with the Defendant John Does and ABC Companies, used Defendant Fake Harmonia and BBK Theatricals Ltd. to produce a revival production of *Titanic the Musical* in 2023 that toured China (with performances in Shanghai, Wenzhou, Hangzhou, Shenzhen and Beijing) and the United Kingdom using the real Harmonia's tradename, intellectual property, proprietary information, knowhow and assets, without authorization from, or any compensation remitted to, Harmonia or Qi;

- Upon information and belief, Defendant Cao used his counterfeit entity Shanghai Cultural Communication to produce the musical *Sanxingdui* in China in 2023, by fraudulently misrepresenting Ms. Qi's affiliate, Shanghai Cultural Development's involvement in the production, for the purpose of deceiving business partners and creative collaborators into believing that Ms. Qi was participating in or had authorized the project, while Cao diverted proceeds of the production to his Shanghai Cultural Communication entity;

- Defendants Dingledine and Cao creating a counterfeit Harmonia investment package in which they altered Harmonia's legitimate Powerpoint slide deck (which Harmonia used to market its productions and developing properties to potential investors), by, among other things, removing all reference to Ms. Qi, in order to lure investors into Defendants' unauthorized theatrical projects through their competing, counterfeit entities, while still using Harmonia's name and good will;

- Defendants Dingledine, Cao and Darwall misappropriating Harmonia's proprietary concept of a development fund to create and foster new works that would and should otherwise be properties of Harmonia.  Dingledine, Cao and Darwall misappropriated the development fund concept and plan, and, upon information and belief, pilfered Harmonia's investor list and talent contacts, to create their own competing development fund for their ersatz Harmonia entities;

- Defendants Dingledine and Fake Harmonia entering into a five-year licensing agreement to mount a production of *Murder on the Orient Express* despite the fact that the real Harmonia already held a license for that property for a term that would overlap with the licensing term sought by Fake Harmonia.

## THE PARTIES

9.      Harmonia Holdings Ltd. is a corporation formed in 2013 by Sophie Qi and organized and existing under the laws of the State of New York, with a principal place of business located in New York City, New York.

10.      Sophie Qi is a natural person residing in the State of New York and is the founder and chief executive officer of Harmonia Holdings Ltd. and its sole shareholder.

11.      Ken Dingledine is a natural person residing in the State of New York and is the president of Harmonia Holdings Ltd., and is also identified as the manager of Harmonia Holdings UK Ltd.  Dingledine is also a co-director of Defendant BBK Theatricals Ltd. along with Defendant Darwall.

12.      Yebo ("Boris") Cao is a natural person residing in Shanghia, China, and is a manager of Harmonia Holdings Ltd. who is responsible for running Harmonia Holdings Ltd.'s Shanghai operations.

13.      Barbara Darwall is a natural person residing in the State of New York.  Darwall is also a co-director of Defendant BBK Theatricals Ltd. formed with Defendant Dindledine.

14.      Royo Holdings Ltd. is a private limited company formed in April 2019 and organized under the laws of England and Wales, for the purpose of producing theatrical performances in Europe and Asia and was co-founded by Messrs. Tom De Keyser ("De Keyser") and Hamish Charles Reid Greer ("Greer").  Royo's service address, as indicated on its Certificate of Incorporation, is Flat 171, Marathon House, Wembley England HA9 0GF.

15.      Harmonia Holdings UK Ltd. is a private limited company formed in July 2021 and organized under the laws of England and Wales, for the purpose of producing theatrical performances in Europe and Asia and was co-founded by De Keyser and Greer, and identifies Dingledine as its Manager on various contracts with its producing partners.  Harmonia Holdings

UK Ltd.'s service address, as indicated on its Certificate of Incorporation, is Flat 171, Marathon House 33 Olympic Way, Wembley England HA9 0GF—the same address as Defendants Royo and BBK. Harmonia Holdings UK Ltd. is unaffiliated with Plaintiffs and has not been authorized to use the HARMONIA trade name by Harmonia Holdings Ltd.

16.     BBK Theatricals Ltd. ("BBK") is a private limited company formed in May 2023 and organized under the laws of England and Whales, for the purpose of producing theatrical performances in Europe and Asia and was co-founded by Defendants Dingledine and Darwall. The "BBK" name is derived from the first initials of Defendants Darwall (Barbara), Cao (Boris) and Dingledine (Ken), and was created to supersede Defendant Harmonia Holdings UK Ltd. in Defendants' scheme to produce unauthorized theatrical productions in Europe and Asia without Plaintiffs' knowledge or consent, and enable Dingledine, Cao and Darwall to benefit from certain tax incentives available to performing arts entities organized under the laws of the United Kingdom.

17.     Pursuant to a document entitled "Term Sheet", the partners of BBK are identified as Dingledine, Cao and Darwall, with each partner allocated 250,000 units in the company. Whereas the Term Sheet indicates that "KBB Theatricals LLC" would be organized in Delaware, it was ultimately formed in the UK as BBK Theatricals Ltd..

18.     Although Plaintiffs were never notified of the existence of BBK by Dingledine, Cao or Darwall, the Term Sheet states "A portion of Net Cash Flow, after tax distributions, will be distributed to Harmonia Holdings, Ltd. until Harmonia has been recouped of its investment (amount TBD)." Neither the real Harmonia nor Qi authorized any investment in BBK, and Harmonia is, in fact, unaware of any monies distributed to it as a recoupment of any investment, or as and for any proceeds from any of BBK's business opportunities (albeit unauthorized) that

were earned while Dingledine and Cao were fiduciaries of Harmonia.  A copy of the KBB Term Sheet is attached as **Exhibit A.**

19.     JOHN DOES 1-10, said names being fictitious, are individuals who are or were involved in the aiding and abetting of and/or actively participated in and helped implement or otherwise personally and directly participated in the wrongful actions set forth in this Complaint.

20.     ABC COMPANIES 1-10, said names being fictitious, are business entities who are or were involved in the aiding and abetting of and/or actively participated in and helped implement or otherwise directly participated in the wrongful actions set forth in this Complaint.

## JURISDICTIONAL AND VENUE STATEMENT

21.     Federal question jurisdiction exists herein pursuant to 28 U.S.C. § 1331, the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*, and by virtue of the claims asserted under the Lanham Act 15 U.S.C. § 1121. The Court has supplemental jurisdiction over the state and common law claims pursuant to 28 U.S.C. § 1367.

22.     This Court has *in personam* jurisdiction over Defendants Dingledine and Darwall, who reside in and are citizens of the State of New York.  The remaining Defendants are persons under this jurisdiction's long-arm statute, and this Court has *in personam* jurisdiction over the Defendants under this long-arm statute.  Defendants directly and through their agents regularly transact business and otherwise derive substantial revenue in this jurisdiction.  Defendants also conduct continuous and systematic economic activities in this jurisdiction.  Defendant Cao is employed by and works for Harmonia which is a New York corporation with its principal place of business located in this District.

**23.**     Venue is conferred by 28 U.S.C. § 1391 as the Defendants regularly and purposefully conducted business in this judicial district and a substantial part of the events giving

rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

24.      Founded in 2013 by Ms. Qi, Harmonia is a Tony-Award winning international entertainment enterprise that integrates live theater production, licensing management, and theater education.  Harmonia collaborates with world-renowned theater professionals to mount first-class productions worldwide.  In recent years, it has produced theatrical performances on Broadway, London's West End, and throughout China.  Among the shows that Harmonia has produced include: *Moulin Rouge! The Musical; Jagged Little Pill; King Kong the Musical; Dear Evan Hansen; 9 to 5 the Musical; Titanic the Musical;* and, *Jersey Boys.*

25.      In April 2017, Qi hired Dingledine to be the president of Harmonia.  As a condition of his employment, Dingledine executed an employment agreement (the "Employment Agreement"), which sets forth the duties, expectations and terms of Dingledine's employment. The Employment Agreement provides, among other things:

> Executive [Dingledine] agrees that he will devote his best efforts and all of this business time, attention and skills to the business of the Company [the real Harmonia], that he will not undertake or engage in any other employment or occupation without the Owner's [Qi] prior written consent; and that he will not acquire, assume, or participate in, directly or indirectly, in any position, investment, or interest adverse or antagonistic to the Company, its Business or prospects, financial or otherwise, or take any actions towards any of the foregoing.

26.      In the section entitled "Confidentiality", Dingledine's Employment Agreement provides:

> As a material inducement to the Company [the real Harmonia] to enter into this Agreement and to pay to the Executive [Dingledine] the compensation stated in Section 4 hereof, the Executive covenants and agrees that he will not, during or after the terms of his employment by the Company, in whole or in part, disclose such Proprietary Information, secrets, information or knowhow to any Person for any reason or purpose whatsoever, nor shall Executive

> make use of any such Proprietary information for his own purposes or for the benefit of any Person (except the Company) under any such circumstances during or after the term of his employment…

27.    In the section entitled "Covenants Against Competition," Dingledine's Employment Agreement provides:

> Except with the prior written consent of the Owner, at all times both during his employment and during the Non-competition Period, the Executive shall not engage in the Restricted Business or any other activities either on the Executive's own behalf or that of any other business organization, that are known to be a direct competitor to the Company (as such competitors are known in usual and customary terms) during the Non-competition Period.

28.    In section 5.1 of The Employee Handbook for Harmonia, entitled "Employee Conduct," the following actions are identified as unacceptable and grounds for disciplinary action: disclosing confidential or proprietary company information without permission, and any other action or conduct that is inconsistent with the company policies, procedures, standards or expectations.

29.    In section 5.5 of The Employee Handbook for Harmonia, entitled "Non-Disclosure and Confidential Information," the Handbook provides:

> Any information that an employee learns about Harmonia, or its members, as a result of working for Harmonia that is not otherwise publicly available constitutes confidential information. Employees may not disclose confidential information to anyone who is not employed by Harmonia or to other persons employed by Harmonia who do not need to know such information to assist in rendering services.
>
> The protection of privileged and confidential information, including trade secrets, is vital to the interests and the success of Harmonia. The disclosure, distribution, electronic transmission or copying of Harmonia's confidential information is prohibited. Such information includes, but is not limited to the following examples:
>
> · Compensation data.
> · Computer processes.

- Customer lists
- Customer preferences
- Financial information
- Marketing strategies

Employees are required to sign a non-disclosure agreement as a condition of employment. Any employee who discloses confidential Harmonia information will be subject to disciplinary action (including possible separation), even if he or she does not actually benefit from the disclosure of such information.

30.    All of the actions complained of in this Complaint occurred while Dingledine was employed by Harmonia.

31.    In or around March 2017, Cao was hired as the Director of Operations and Director of Finance by Harmonia.  Cao was based out of Harmonia's Shanghai office, and was responsible for financial, administrative, investment, and risk management operations for Harmonia, including the development of a financial and operational strategy.

32.    In his role as Director of Finance, Cao was exposed to Harmonia's most sensitive Proprietary information, intellectual property, investor information and trade secrets.  Among Cao's responsibilities set forth in the Job Description for Director of Finance, Cao was expected to, among other things:

- Assist in formulating the company's future direction and supporting strategic initiatives;
- Oversee the financial operations of international offices and subsidiary companies;
- Monitor and direct the implementation of strategic business and sales plans;
- Identify and develop new profit centers within the company;
- Grow Harmonia IP assets through capital funding and targeted acquisition;
- Oversee the accounting, investor relations, legal, tax, and treasury areas;
- Create, raise and manage the Harmonia Global investment fund for investment targets/acquisition including assessment, due diligence and acquisition negotiation;
- Coordinate closely with sales area to develop sales strategies and drive sales revenue;
- Manage the company budgeting and budget actualization process;
- Represent the company to investors giving regular updates and investment status; and,
- Develop key company financial performance measurement tools and reports that

support the company's strategic direction.

33.     All of the actions complained of in this Complaint occurred while Cao was employed by Harmonia.

34.     In or around February 2021, Harmonia hired Darwall, a veteran Broadway producer, as a consultant and paid a monthly fee of $1250.  As a condition of her employment, Darwall executed a consultant agreement.

<u>Defendants' Scheme to Defraud Plaintiffs</u>

35.     The ink was barely dry on Darwall's consulting agreement when Defendants Dingledine, Cao and Darwall began their scheme of diverting business away from Harmonia by using their acquired knowledge of Harmonia's proprietary information, intellectual property, investor information, trade secrets and knowhow.

36.     In furtherance of their scheme, Defendants created, or caused to be created, a web of entities, shielded from Plaintiffs, to divert business and opportunities from Harmonia, while relying upon Harmonia's proprietary information and knowhow to produce theatrical performances for their own enrichment and to the exclusion of the real Harmonia.

37.     The first phase of Defendants' scheme was the creation of overseas entities that they would use to hold themselves out to investors, producers and theatrical talent to divert production opportunities away from the real Harmonia.  To maximize their influence and obtain credibility, Dingledine, Cao and Darwall exploited the HARMONIA brand, and conspired with Defendant Royo and John Does 1 through 10 and ABC Companies to form Defendant Harmonia Holdings UK Ltd—"Fake Harmonia" in July 2021.

38.     Fake Harmonia was not authorized by Harmonia to incorporate the HARMONIA trade name, trade dress or service mark.  Although Dingledine is identified on various contracts as

Fake Harmonia's Managing Director, Dingledine hid the existence of Fake Harmonia from Ms. Qi, and did not receive authorization from Plaintiffs to appropriate the HARMONIA brand into the Fake Harmonia entity.

39.     Defendants used the Fake Harmonia entity, as well as BBK, and Harmonia's proprietary information and investor contact information to attract would-be investors and co-producers to mount European and Asian revival productions of musicals which Harmonia had recently produced in those regions. Dingledine and Cao used their actual Harmonia email accounts, which prominently featured the HARMONIA logo in the signature block, to conduct business on behalf of Fake Harmonia.

<u>The 2023 United Kingdom and China touring productions of *Titanic the Musical*</u>

40.     In 2018, Harmonia, under Dingledine and Cao, mounted a production of *Titanic the Musical* that toured the United Kingdom.  In 2019, Harmonia produced a Chinese tour of *Titanic the Musical.*

41.     Eager to exploit the real Harmonia's successful 2019 production of *Titanic the Musical* in China and 2018 tour in the UK, Dingledine, Chao and Darwall misappropriated Harmonia's proprietary information, intellectual property  and knowhow from the 2019 and 2018 *Titanic* productions to launch revival productions of *Titanic the Musical* that toured both the UK and China—albeit this time, ***not through the real Harmonia***, but instead through Defendants' clandestine and counterfeit entities, Fake Harmonia and BBK.

42.     In an email from Cao (using his real Harmonia email account) to YC Yang dated August 16, 2023, Cao confirms that "Harmonia not only serves as the tour manager [for the *Titanic* UK tour] and the international tour producer of the Asian version of the play, Harmonia is also one of the co-producers of the UK tour."  The email reads: "Presented by Danielle Tarento in

association with Mayflower Theatre, Harmonia, Bruce Robert Harris and Jack W Batman…" (emphasis in original).  Immediately following that text, Cao confirms he is pitching this not on behalf of his employer, Harmonia, but rather on behalf of the counterfeit entity, stating "Harmonia in the above text means Harmonia [Holdings] UK Ltd."  Cao further writes, "The authorized party Harmonia UK Ltd serves as a performance agent and acts as an agent for domestic performances of Titanic."  Further in the email, Cao confirms that "Harmonia [Holdings] UK Ltd was established on July 9, 2021."  A copy of Cao's email, in the original Chinese and an English translation via Google Translate are attached as **Exhibit B.**

43.    In a subsequent email, Cao writes, "Also, regarding Harmonia UK Ltd…I can confirm that the entity set up for you – Harmonia Holdings UK Ltd (13504236) has been superseded by BBK Theatricals Ltd (details here – https://find-and-update.company-information.service.gov.uk/company/14884082) and that BBK  Theatricals Ltd is carrying out the production activity for your productions including Titanic the Musical, the Last 5 Years, Once as others."

44.    Cao's email further confirms Defendants' involvement in the 2023 Chinese tour of *Titanic the Musical*, "At present, all the rights and interests of Harmonia UK Ltd have been transferred to BBK Theatricals Ltd.  Therefore, regarding the situation in Pingshan, Shenzhen, the best solution is: 1. Danielle [Tarento] signs a letter of authorization authorizing BBK Theatricals Ltd. 2, Pingshan signed a contract directly with BBK Theatrical Ltd. 3.BBK Theatrical Ltd issues invoices directly to Pingshan [Performing Arts Center located in Shenzhen, China]."

45.    The 2023 Chinese tour of *Titanic the Musical* ran from October through December, with productions in Taiwan, Shanghai, Wenzhou, Hangzhou, Shenzhen and Beijing.

46.    To facilitate the business-side of the UK tour of *Titanic,* Tarento formed the entity

Titanic the Musical UK Limited on August 9, 2022, for which she was appointed to serve as a director and held 75% of the company's shares.

47.    According to the official website of the *Titanic the Musical* UK tour (https://titanicthemusical.co.uk/tour.php), the show ran from June 27, 2023 through August 5, 2023 at six different venues throughout England and in Dublin, Ireland.  To remove all doubt, the website confirms that Danielle Tarento, the person identified in Cao's correspondence, is the Producer/GM/Casting Director.

48.    Neither Defendants nor Fake Harmonia nor BBK received authorization from Harmonia to mount the 2023 *Titanic the Musical* UK or Chinese tour.  In addition, by creating the counterfeit entities, the revenue generated by those tours were diverted by their furtive scheme to those counterfeit entities rather than Harmonia.

49.    While owing fiduciary duties to Plaintiffs, Defendants diverted the business opportunity to produce and share in the profits (derived from both ticket and merchandise sales) of the 2023 *Titanic the Musical* UK and Chinese tour away from Harmonia and Qi.

*Sanxingdui* and *Peter Rabbit*

50.    In addition to Fake Harmonia and BBK, Defendant Cao created a counterfeit entity called, upon information and belief, Shanghai Theatrical Dreams Cultural Communication Ltd. ("Shanghai Cultural Communication") on or about March 2023 and organized under the laws of China, for the purpose of competing with Plaintiffs by producing theatrical performances in Asia by intentionally misleading investors, artists, and theatrical craftsmen into believing that they were doing business with Ms. Qi's affiliate Shanghai Theatrical Cultural Development Ltd, ("Shanghai Cultural Development") an entity organized under the laws of China that Ms. Qi wholly owns and created in 2018 to produce theatrical productions in China.  In Chinese, these two companies share

almost identical names, especially their short names, which are both written as 剧梦 which translates to "theatrical dreams", making the two companies difficult to distinguish;

51.    In an email dated August 4, 2023, Cao, using his real Harmonia email account, acknowledges that he is the "individual owner" of "Shanghai Theatrical Dreams" (presumably a reference to his counterfeit entity, the Shanghai Cultural Communication company), and that his entity has contracts for *Peter Rabbit* in Suzhou, China, and *Disney Gala* in Ninjing.  A copy of the August 4, 2023 email is attached as **Exhibit C.**

52.    In an online article titled "Peter Rabbit bounces into new puppet play for children" published on or about May 11, 2023 on the website, https://www.shine.cn/feature/entertainment/2305114182/, it identifies "Harmonia Theatrical" and Rockefeller Productions as "[j]ointly presenting" *The Tale of Peter Rabbit,* and features the following image:



53.    The article proceeds to quote Cao extensively, and he is identified in the article as "general manager of Harmonia Theatrical."

54.    Upon information and belief, Cao exploited his affiliation with Harmonia and his entity Shanghai Cultural Communication's nearly identical name to Ms. Qi's entity, Shanghai Cultural Development, to misrepresent, confuse, and induce co-producers, investors and the public into believing that *Peter Rabbit* was produced by the real Harmonia and/or Ms. Qi.

55.    Neither Cao nor Shanghai Cultural Communication received authorization from Harmonia or Ms. Qi to produce, or participate in the 2023 production of *Peter Rabbit.*

56.    While owing fiduciary duties to Plaintiffs, Cao diverted the business opportunity to produce and share in the profits (derived from both ticket and merchandise sales) of the *Peter Rabbit* tour away from Harmonia and Ms. Qi.

*Sanxingdui*

57.    Cao employed a similar scheme of exploiting his entity Shanghai Cultural Communication's nearly identical name to Ms. Qi's entity Shanghai Cultural Development to mount an unauthorized 2023 production of the Chinese cultural production *Sanxingdui,* which according to the Director Service Agreement, contemplated five rounds of touring, spanning from October 2023 through January 2028.

58.    Plaintiffs were never advised of, nor authorized their participation in *Sanxingdui.* Nonetheless, Dingledine directed Cao to enter into contracts to co-produce *Sanxingdui,* and pay certain production and travel expenses. In an email dated October 10, 2023, Dingledine (from his real Harmonia email account), instructs De Keyser (presumably on behalf of either Defendant Royo or Fake Harmonia) to make certain payments, while Cao is to make other payments to certain creative artists working on the project.

*Murder on the Orient Express*

59.    In 2021, Fake Harmonia entered into a licensing agreement with Agatha Christie

Limited ("ACL") to acquire an exclusive license to Christie's famous work, *Murder on the Orient Express.*  According to the terms of the license agreement, Fake Harmonia was granted a five-year, four-month exclusive license, from September 1, 2021 through December 26, 2026  "to present and perform a new professional production of the Work (the 'Production') in both the English Language and Mandarin Language in the Territory [defined as Greater China, Hong Kong, Macau and Taiwan]."   In the licensing agreement, Dingledine is identified as the contact for Fake Harmonia, and lists Dingledine's New York address, cell phone number and the email address: ken@harmoniaholdings.com--Dingledine's company email address with the real Harmonia.  On the signature page, Dingledine executed the agreement on behalf of Fake Harmonia, and is identified as its Director.

60.    As consideration for acquiring the *Murder on the Orient Express* exclusive license, Fake Harmonia was required to pay ACL a non-returnable advance of GBP 40,000.  Upon information and belief, Dingledine authorized payment of the advance using monies from Harmonia, without authorization from Plaintiffs, or even informing Qi of the opportunity.

61.    In addition to the foregoing, and because Defendants have resorted to using their various clandestine entities to surreptitiously stage unauthorized productions since as early as 2021, it is believed that Defendants have participated in, under the guise of the authority and authorization of Plaintiffs, unauthorized productions in the United Kingdom and China of, but not limited to, the following: *Disney Gala 2022; The Very Hungry Caterpillar; Oliver Twist Le Musical; Spring Awakening; The Last Five Years; The Reunion Concert* (featuring Ramin Karimloo and Samantha Barks)—all by misappropriating Plaintiffs' proprietary information, intellectual property, investor information and contacts, trade secrets and knowhow, and by willfully infringing on Harmonia's trademarks.

Spring Package

62.     Defendants Dingledine, Cao and Darwall also misappropriated and altered Harmonia's slide deck that it uses to market itself to investors for future productions.  The real Harmonia refers to this slide deck as its "Spring Package."

63.     At the bottom each of the slides in the Spring Package deck is the notation, "The information contained in this document is confidential, privileged and only for the information of the intended recipient and may not be used, published or redistributed without the prior written consent of Harmonia."

64.     Defendants' doctored, phony version of the Spring Package removes all reference to Ms. Qi, the sole shareholder, founder, and chief executive officer of Harmonia.  Moreover, Defendants larded up the Spring Package with publicity photos and posters of the many unauthorized productions it has produced.

65.     Upon information and belief, Defendants used this altered version of the Spring Package, derived and stolen from Harmonia, and one of Harmonia's most valuable trade secrets, to further their scheme to solicit investors and divert business to their unauthorized entities at the expense of Plaintiffs.

66.     Through their theft of Plaintiffs' proprietary information, intellectual property, investor contact information trade secrets and knowhow, including but not limited Plaintiffs' processes, rolodex of investor and theatrical contacts, formulas and metrics for producing shows, as well as Defendants' brazen theft of the Spring Package slide deck, Defendants have violated the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq.*

The Lanham Act Allegations

67.     Defendants have also infringed upon Plaintiff's valuable and well-recognized mark

HARMONIA and, accordingly, this Complaint alleges, *inter alia,* infringement of Plaintiff's common law trademarks under Section 32(1) of the Lanham Act, 15 U.S.C. §1125; unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a); and for substantial and related claims under the statutory and common laws of the State of New York.

68.    Harmonia has used the HARMONIA name in connection with national and international theater productions for 10 years.  The HARMONIA name has been synonymous with the creation, licensing, development, marketing, producing, advertising and performance of unique intellectual properties and quality Broadway shows both in the United States and overseas, particularly in the United Kingdom, the European Union and the People's Republic of China ("China").  Plaintiff has a pending application for trademark registration of the mark HARMONIA  with the U.S. Patent and Trademark Office (USPTO) for International Class 041, in the areas of, *inter alia*, theatre productions, entertainment services in the nature of theater productions, educational services in the field of theater and acting, entertainment services for theater production, licensing management, representing Broadway, West End and Theatre for young audience productions.  The application was filed under Application Ser. No. 98266285.[1]

---

[1] The full panoply of services in the application are as follows: "Theatre productions; entertainment services in the nature of theater productions; Educational services, namely, conducting seminars and workshops in the field of theater and acting; providing educational courses relating to acting, singing and theater; management of professional and amateur licensing for licensing companies; entertainment services for theater production; licensing management for licensing companies for theaters, theatrical agents and agencies; representing Broadway, West End and Theatre for young audience productions; producing shows and entertainment to local venues; managing live stage performance copyrights for plays and musicals and encouraging local productions; providing operational management, government relations, budgeting, contracting and logistics to theatrical producers; building high quality sets, props and costumes for theater productions; providing theatre analytics, writing, design, advertising, public relations, press and event services for theater productions; theater arts education programs; providing camp-style programs ranging from introductory theater arts

69.    In addition, Harmonia owns a common law mark and has common law rights in and to its HARMONIA mark.  The HARMONIA mark has been used in commerce continuously by Harmonia for 10 years.  Harmonia has garnered extensive press reporting as to its name, and the HARMONIA Mark is prominently displayed in the marketing materials and advertising of many of the shows it develops, licenses and produces.

70.    The claims stated herein arise, in part, from Defendants' blatant and willful trading upon and stealing Harmonia's goodwill and infringing upon its intellectual property, including through Defendants' unauthorized use of and attempts to improperly coopt for themselves Plaintiff's valuable and unique HARMONIA mark in the area of theater performance, development of intellectual and theatrical performances, creation, exhibition, licensing and production of such properties and products.

71.    In particular, Defendants Dingledine and Cao, while still employed by and paid by Harmonia, have conspired with Royo, Darwall and Defendants John Does 1 through 10 and ABC Companies to secretly create shadow companies, furtively appropriating for themselves the HARMONIA mark and have attempted to palm off their services as being those of Plaintiffs, the legitimate owners of the HARMONIA mark, while in fact, secretly using the HARMONIA mark and good will to secretly obtain revenues for themselves at the expense of Plaintiffs.

72.    For example, Defendants, as noted above, have created a company called HARMONIA HOLDINGS UK LTD. in the United Kingdom (Fake Harmonia) in an attempt to fraudulently present it as a legitimate Harmonia entity when, in fact, it was set up for the purpose of funneling revenue away from Plaintiffs and into their own personal accounts.  In addition, upon

---

seminars for elementary, middle school and high school performers to professional performer master classes."

information and belief, Defendants, set up at least two U.S. limited liability companies with the name "Harmonia" in an effort to steal Plaintiff's clients, investors, intellectual and theatrical properties, good will and core business.

73.    Additionally, Defendants Dingledine, Cao and Darwall have created various counterfeit sham investor packages for development and production of theatrical and intellectual properties, designed to look like they were created by and authorized by Harmonia when, in fact, they have illegally and surreptitiously created such counterfeit materials without the knowledge of or any benefit accruing to the true owner of said rights, Plaintiff, Harmonia.

74.    Moreover, Defendants Dingledine, Cao and Darwall conduct business correspondence for their unauthorized entities using their real Harmonia email accounts, which prominently contain Harmonia's logo, and falsely give the imprimatur of being authorized and authentic Harmonia communications with the intent of deceiving and confusing unknowing recipients and reaping the benefits for themselves of Harmonia's good will and name recognition.

75.    Unless Defendants are enjoined from infringing upon Harmonia's intellectual property rights and otherwise deceiving the consuming public and appropriating Harmonia's goodwill, Harmonia will continue to suffer substantial damage and ongoing and irreparable harm.

76.    Plaintiff requests judgment against Defendants, and injunctive relief including an appropriate order restraining Defendants from using Harmonia's Proprietary Information, trade secrets, knowhow, and trade marks.

**AS AND FOR A FIRST CAUSE OF ACTION**
(Breach of Contract)
Against Dingledine

77.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if set forth fully and at length herein.

78.     Dingledine entered into an Employment Agreement with Harmonia on or about April 17, 2017 wherein Dingledine was hired by Plaintiff Harmonia to serve as its President.

79.     Pursuant to the Employment Agreement, Defendant Dingledine covenanted to devote his best efforts and all of this business time, attention and skills to the business of Plaintiff Harmonia, and that Dingledine would not undertake or engage in any other employment or occupation without the Plaintiff Qi's prior written consent; and that he will not acquire, assume, or participate in, directly or indirectly, in any position, investment, or interest adverse or antagonistic to the Company, its Business or prospects, financial or otherwise, or take any actions towards any of the foregoing.

80.     Pursuant to the Employment Agreement, Dingledine covenanted that he would not, during or after the terms of his employment by Plaintiff, Harmonia, in whole or in part, disclose such Proprietary Information, secrets, information or knowhow to any Person for any reason or purpose whatsoever, or make use of any such proprietary information for his own purposes or for the benefit of any Person (except the Company) under any such circumstances during or after the term of his employment

81.     Pursuant to the Employment Agreement, Dingledine covenanted that he would not engage in the Restricted Business or any other activities either on his own behalf or that of any other business organization, that are known to be a direct competitor to Harmonia during the Non-competition Period.

82.     Dingledine breached his Employment Agreement by devoting significant business time, attention and skills in furtherance of the business of Fake Harmonia, BBK Theatricals Ltd., and Shanghai Cultural Communication to produce theatrical productions in direct competition with, and divert business from, Harmonia.

83.     Dingledine breached his Employment Agreement by working in the employ of Fake Harmonia, having the title of Manager, and BBK Theatricals Ltd., as co-director, while simultaneously being employed by Harmonia, without consent from Plaintiffs, during the Non-competition Period.

84.     Dingledine breached his Employment Agreement by misappropriating Harmonia's Proprietary Information, trade secrets, information and knowhow to divert business away from Plaintiffs in order to aid and further the business of Fake Harmonia, BBK Theatricals, Royo, and Shanghai Cultural Communication, by using Harmonia's Proprietary Information, trade secrets, and knowhow to recruit investors, hire creative talent, and produce theatrical productions in Europe and Asia for Fake Harmonia, BBK Theatricals, Royo and Shanghai Cultural Communication without authorization and to the detriment of the real Harmonia.

85.     As a direct and proximate result of Dingledine's actions described above, and each of Dingledine's breaches of his Employment Agreement, Dingledine has caused, and will continue to cause Plaintiffs to suffer substantial monetary damages, as well as further and even greater damage in the future.

86.     By virtue of Dingledine's breaches of contract, Harmonia has been injured in an amount to be determined at trial, but in excess of Ten Million Dollars ($10,000,000).

### AS AND FOR A SECOND CAUSE OF ACTION
(Breach of Contract)
Against Cao

87.     Plaintiffs repeat and realleges each and every one of the foregoing allegations as if set forth fully and at length herein.

88.     Cao was hired by Harmonia to serve as its Director of Operations and Director of Finance.

89. In his positions with Harmonia, Cao was expected to devote his best efforts and all of this business time, attention and skills to the business of Harmonia, and, given the sensitivity of the proprietary information, trade secrets and knowhow to which Cao was responsible for managing, not to undertake or engage in any other employment or occupation without the Plaintiff Qi's prior written consent; and that he will not acquire, assume, or participate in, directly or indirectly, in any position, investment, or interest adverse or antagonistic to the Company, its Business or prospects, financial or otherwise, or take any actions towards any of the foregoing.

90. Given his position as a fiduciary to Harmonia, it was expected that Cao would not, during or after the terms of his employment by Harmonia, in whole or in part, disclose such Proprietary Information, secrets, information or knowhow to any Person for any reason or purpose whatsoever, or make use of any such Proprietary information for his own purposes or for the benefit of any Person (except the Company) under any such circumstances during or after the term of his employment.

91. Cao breached his employment agreement by devoting significant business time, attention and skills in furtherance of the business of Fake Harmonia, BBK Theatricals Ltd., and Shanghai Cultural Communication to produce theatrical productions in direct competition with, and divert business from, the real Harmonia.

92. Cao breached his Employment Agreement by working in the employ of Fake Harmonia, having the title of Manager, and BBK Theatricals Ltd., as co-director, while simultaneously being employed by Harmonia, without consent from Plaintiffs, during the non-competition Period.

93. Cao breached his Employment Agreement by misappropriating Harmonia's Proprietary Information, trade secrets, information and knowhow to divert business away from

Plaintiffs in order to aid and further the business of Fake Harmonia, BBK Theatricals, Royo, and his Shanghai Dreams entity, by using the real Harmonia's Proprietary Information, intellectual property, investor contact information, trade secrets, and knowhow to recruit investors, hire creative talent, and produce theatrical productions in Europe and Asia for the counterfeit Fake Harmonia, BBK Theatricals, Royo and Cao's Shanghai entity and Taiwan entity IMIC Cultural Media Ltd. without authorization and to the detriment of Harmonia.

94.    As a direct and proximate result of Dingledine's actions described above, and each of Dingledine's breaches of his Employment Agreement, Dingledine has caused, and will continue to cause Plaintiffs to suffer substantial monetary damages, as well as further and even greater damage in the future.

95.    By virtue of Dingledine's breaches of contract, Harmonia has been injured in an amount to be determined at trial, but in excess of Ten Million Dollars ($10,000,000).

## AS AND FOR A THIRD CAUSE OF ACTION
(New York Faithless Servant Doctrine)
Against Dingledine, Cao and Darwall

96.    Plaintiff Harmonia repeats and realleges each and every one of the foregoing allegations as if set forth fully and at length herein.

97.    Defendants Dingledine, Cao and Darwall's substantial breaches of their respective employment agreements and breaches of their fiduciary duty permeates their service to Harmonia in their most substantial part.

98.    Defendant Dingledine's disloyalty to Harmonia dates at least as far back as the formation of Fake Harmonia, on or before July 9, 2021.

99.    Defendant Cao's disloyalty to Harmonia dates at least as far back as the formation of Fake Harmonia, on or before July 9, 2021.

100.   Defendant Darwall's disloyalty to Harmonia dates at least as far back as the formation of Fake Harmonia, on or before July 9, 2021.

101.   During the period of July 9, 2021 to on or about December 14, 2023, upon information and belief, Mr. Dingledine received a total of [$300,000] from Harmonia.

102.   During the period of July 9, 2021 to on or about December 13, 2023, upon information and belief, Cao received a total of [$300,000] from the Harmonia.

103.   During the period of July 9, 2021 to on or about December 14, 2023, Darwall received a total of [$37,500] from Harmonia.

104.   Defendants Dingledine, Cao and Darwall's violation of the New York Faithless Servant Doctrine compels forfeiture of their compensation from Harmonia during the respective periods of their disloyalty.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Violation of the Defend Trade Secrets Act 18 U.S.C. § 1832 *et seq.*)
Against Dingledine, Cao and Darwall

105.   Plaintiff repeats and realleges each and every one of the foregoing allegations as if set forth fully and at length herein.

106.   Defendants Dingledine, Cao and Darwall, either acting individually and/or in concert stole Plaintiffs' trade secrets, as set forth more fully above.

107.   The trade secrets involving Harmonia's process, procedures, investor and theatrical artist contact information, tradesmen, and producing partners, were first stolen by Defendants in or about July 9, 2021.

108.   Dingledine, as Harmonia's President, used his employees, including Cao and Darwall, as knowing participants in an ongoing conspiracy to steal and utilize Harmonia's trade secrets for their own pecuniary gain.

109.    These Defendants conspired, either separately or in concert, to purloin Plaintiffs' trade secrets through an ongoing scheme of soliciting Harmonia's investors and creative partners to fund and collaborate with Defendants to produce theatrical productions (many of which were previously staged by Harmonia in recent touring productions) in venues and with personnel commonly used by Harmonia throughout Europe and Asia without authorization from Plaintiffs. Defendants continue to use, for their own enrichment, the trade secrets and knowhow they have stolen.

110.    To execute this ongoing scheme, Defendants resorted to: creating entities that incorporate the "HARMONIA" trade name, such as Fake Harmonia, without authorization from Plaintiffs and with the intent to confuse investors, business partners, the theatrical community and the public; altering the real Harmonia's investor deck to remove reference to Plaintiff Qi for the purpose of drawing upon Harmonia's proprietary investment sources and inducing said investment instead in Defendants' unauthorized entities and diverting business opportunities from Harmonia; using their real Harmonia email accounts that prominently featured the HARMONIA logo  for their own, for the sole purpose of mispresenting to investors, business partners and the theatrical community that Defendants' communications were authentic and authorized by the real Harmonia; using formulas, spreadsheets, schedules, templates, etc. devised by Harmonia to manage unauthorized theatrical productions; and accessing Harmonia's bank accounts and funds to pay for various production, travel and personal expenses for unauthorized productions;   utilizing Harmonia's budgets, technical information, financial models, techniques and projections and incorporating same into their own counterfeit productions.

111.    The DTSA provides a federal cause of action to the owner of trade secrets which are misappropriated and are related to products or services used in, or intended for use in, interstate

or foreign commerce. 18 U.S.C. § 1836(b).

112.    A trade secret is defined within DTSA as "all forms and types of financial, business, scientific, technical, economic, or engineering information," including, *inter alia,* "plans," "formulas", "methods", "techniques", "processes," and "procedures" if "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value ... from not being generally known ... [or] readily ascertainable ... [to] another person who can obtain economic value from the disclosure or use of the information[.]" 18 U.S.C. 1839(3)(A)-(B).

113.    Here, Harmonia's methods, processes, procedures, plans and formulas for inducing investors to invest in its productions, as well as the tremendous administrative process of producing and staging its productions, and its budgets, technical information, financial models, techniques and projections are all trade secrets that Defendants misappropriated. Harmonia and Qi, as owners of the trade secrets, took more than reasonable measures to keep their information secret by requiring strict nondisclosure and/or confidentiality agreement of its Proprietary Information.

114.    Dingledine himself acknowledged that the methods and techniques Harmonia utilizes to launch successful productions internationally is its "secret sauce."[2]

115.    Defendants repeatedly disclosed and used Plaintiffs' trade secrets by improper means, and at the time of disclosure, and even today, knew or had reason to know that these trade secrets were acquired and/or used through improper means and under circumstances giving rise to a duty to maintain their secrecy or derived from or through a person who owed such a duty. 18 §

---

[2] *Deadline Magazine*, July 18, 2019, "Harmonia Bridges Broadway And China With Productions Of 'King Kong,' 'Titanic' And More," at https://deadline.com/2019/07/harmonia-bridges-broadway-and-china-with-productions-of-king-kong-titanic-and-more-1202647654/ (last viewed December 10, 2023).

U.S.C. § 1839(5).

116.    Further, the actions of Defendants are continuing misappropriations which continue to occur.  Consequently, it is respectfully alleged that Plaintiffs have a viable continuing misappropriation claim under the DTSA, which defines misappropriation as the "disclosure or *use of a trade secret*" and Plaintiffs allege that Defendants continue to use Plaintiffs' trade secrets to this day.

117.    Plaintiffs demands judgment in their favor against Dingledine, Cao and Darwall for their violations of the DTSA, and request actual and multiplied compensatory damages, attorneys' fees, and such other and further relief available under the DTSA as this Court deems just and proper.

118.    In addition, Plaintiffs seek injunctive and equitable relief in addition to damages therefor.

<u>**AS AND FOR A FIFTH CAUSE OF ACTION**</u>
(Common law Misappropriation of Trade Secrets)
Against Dingledine, Cao and Darwall

119.    Plaintiff repeats and realleges each and every one of the foregoing allegations as if set forth fully and at length herein.

120.    Harmonia's methods, processes, procedures, plans and formulas for inducing investors to invest in its productions, as well as the tremendous administrative process of producing and staging its productions, are the trade secrets, as that term is defined under New York State law.

121.    Harmonia and Qi, as owners of the trade secrets, guarded the secrecy and confidentiality of these trade secrets, the information of which was of high value to their competitors, having cost a great deal of time and money to develop and create, and which constitute a unique business operation.  These trade secrets were never exposed to the public and their content

was never in the public domain.

122.    Harmonia's trade secrets were accessed by Dingledine, Cao and Darwall without authorization, and were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets, and their use was improper.

123.    Dingledine, Cao and Darwall are still in possession of Harmonia's trade secrets and are using them for their commercial advantage.

124.    Plaintiffs request compensatory damages for lost profits caused by the misappropriation and an accounting of all of the Defendants' profits generated by the misappropriated trade secrets and request injunctive and equitable relief.

### AS AND FOR A SIXTH CAUSE OF ACTION
(Violation of the Lanham Act for Unfair Competition, False Endorsement, 15 U.S.C. § 1125(a)(1)(A))
Against All Defendants

125.    Plaintiff Harmonia repeats and realleges each and every one of the foregoing allegations as if set forth fully and at length herein.

126.    Through the use of Harmonia's famous HARMONIA trademark, designation on theatrical marketing and advertisements, in contracts and in email correspondence bearing the HARMONIA logo and other design elements that are owned by and/or publicly associated with Harmonia, Defendants have,, and continue to, knowingly and intentionally misrepresent and falsely designate to the general public the affiliation, connection, association, origin, source, sponsorship, endorsement and approval of Harmonia Holdings UK Ltd., and intend to misrepresent and falsely designate to the public the affiliation, connection, association, origin, source, sponsorship, endorsement and approval of Harmonia Holdings UK Ltd., so as to create a likelihood of confusion by the public as to the affiliation, connection, association, origin, source, approval, endorsement and sponsorship of Harmonia Holdings UK Ltd.

127.    The aforesaid acts of the Defendants constitute false endorsement and unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

128.    As a direct and proximate result of the foregoing acts of Defendants, Plaintiffs have been damaged and have suffered and will continue to suffer immediate and irreparable injury.

129.    Harmonia has no completely adequate remedy at law and is therefore entitled to preliminary and permanent injunctive relief.

130.    In addition, Plaintiff seeks disgorgement of profits, restitution of all monies taken from Harmonia and improperly utilized for the expense of running Defendants' counterfeit productions, and for an award of Plaintiff's attorneys fees, costs and expenses.

### AS AND FOR AN SEVENTH CAUSE OF ACTION
(False Advertising—15 U.S.C. § 1125(a)(1)(B))
Against Cao and Darwall

131.    Plaintiff repeats and realleges each and every one of the foregoing allegations as if they were set forth fully and at length herein.

132.    Defendants have improperly used Plaintiff's HARMONIA Mark in conjunction with advertising their counterfeit entities and their illicit productions.

133.    The aforesaid acts of the Defendants constitute false advertising and unfair competition in violation of 15 U.S.C. § 1125(a)(1)(B).

134.    As a direct and proximate result of the foregoing acts of Defendants, Plaintiffs have been damaged and have suffered and will continue to suffer immediate and irreparable injury.

135.    Harmonia has no completely adequate remedy at law and is therefore entitled to preliminary and permanent injunctive relief.

136.    In addition, Plaintiff seeks disgorgement of profits, restitution of all monies taken from Harmonia and improperly utilized for the expense of running Defendants' counterfeit

productions, and for an award of Plaintiff's attorneys fees, costs and expenses.

**AS AND FOR A EIGHTH CAUSE OF ACTION**
(Pled in the Alternative--Unjust Enrichment)
Against Cao and Darwall

137.    Plaintiff repeats and realleges each and every one of the foregoing allegations as if set forth fully and at length herein.

138.    Defendants' actions as set forth herein above constitute unjust enrichment.

139.    Cao and Darwall received payment as contractors/consultants for Harmonia, for what Harmonia believed was their faithful service in Plaintiff's employ.

140.    As detailed above, Cao and Darwall, did not, however, devote their time and energy for the benefit of Harmonia, but instead, participated in a scheme to divert business opportunities away from Harmonia for their own enrichment.

141.    Qi would not have allowed Harmonia to employ Cao and Darwall had she known of Defendants' scheme to steal Harmonia's trade secrets and trademarks to divert business opportunities from Harmonia for Cao and Darwall's own enrichment.

142.    Since the inception of Defendants' scheme to defraud Harmonia, Cao and Darwall have been paid substantial sums of money.  In addition, they have improperly requisitioned and secretly paid for the costs and expenses for their counterfeit entities' productions and projects out of Harmonia assets and revenue.

143.    It would be contrary to equity and good conscience to permit Cao and Darwall to retain any pecuniary gains they have reaped by way of their unscrupulous conduct.

144.    By virtue of Cao and Darwall's unjust enrichment, Plaintiff has been directly, proximately and substantially injured and seeks disgorgement and restitution of Cao and Darwall's ill-gotten gains in an amount to be proven at trial.

**AS AND FOR A NINTH CAUSE OF ACTION**
(Breach of Fiduciary Duty)
Against Dingledine and Cao

145.    Plaintiff repeats and realleges each and every one of the foregoing allegations as if set forth fully and at length herein.

146.    As officers of Harmonia who were custodians of the company's most sensitive trade secrets and entrusted with its operations, Dingledine and Cao owe fiduciary duties of care and loyalty, and the highest obligation of good faith and fair dealing to Harmonia.

147.    Dingledine and Cao's wrongful acts, including but not limited to: orchestrating a scheme to divert business opportunities away from Harmonia by conspiring to create entities that incorporate the "HARMONIA" trade name, such as Fake Harmonia, without authorization from Plaintiffs, and with the intent to confuse investors, business partners, the theatrical community and the public; altering Harmonia's investor deck to remove reference to Plaintiff Qi for the purpose of inducing investment in Defendants' unauthorized entities and diverting business opportunities from Harmonia; using Harmonia email accounts that prominently feature the HARMONIA logo to mispresent to investors, business partners and the theatrical community that Defendants' communications were authentic and authorized by Harmonia; using formulas, spreadsheets, schedules, templates, and knowhow devised by Harmonia to develop, manage and produce unauthorized theatrical productions and achieve a competitive advantage over Plaintiffs; and accessing Harmonia's bank accounts and funds to pay for various production, travel and personal expenses for unauthorized productions—all while Dingledine and Cao were still officers of Harmonia and owed fiduciary duties to Plaintiffs.

148.    As a result of these actions, Dingledine and Cao breached their fiduciary duties of loyalty, good faith, fair dealing and due care, and constitutes a usurpation of business

opportunities.

149.     As a direct and proximate result of Dingledine and Cao's actions described herein, Dingledine and Cao have caused, and will continue to cause Plaintiffs to suffer substantial monetary damages, as well as further and even greater damage in the future, including damage to Plaintiffs' reputation and good will.

150.     Plaintiffs have been directly and substantially injured by reason of Dingledine and Cao's conduct, and as a result, Plaintiffs seek damages and other relief in an amount to be proven at trial.

### AS AND FOR A TENTH CAUSE OF ACTION
(Conversion)
Against Dingledine and Cao

151.     Plaintiffs repeat and reallege each and every one of the foregoing allegations as if they were set forth fully and at length herein.

152.     As set forth above, Dingledine and Cao funneled funds from Harmonia's bank account, to the exclusion of Harmonia, to fund their production expenses, travel and personal expenses, for productions that they were producing for Fake Harmonia and other entities unaffiliated with and unauthorized by Harmonia and Ms. Qi.

153.     Plaintiffs have been directly and substantially injured by reason of Dingledine and Cao's conversion, and as a result, Plaintiffs seek damages in an amount to be proven at trial.

### AS AND FOR A ELEVENTH CAUSE OF ACTION
(Tortious Interference with Prospective Economic Advantage)
Against All Defendants

154.     Plaintiffs repeat and reallege each and every one of the foregoing allegations as if they were set forth fully and at length herein.

155.     Defendants, by virtue of their theft of Plaintiffs' trade secrets and exploitation

thereof, deprived Plaintiffs of valuable economic.

156.    As such, Plaintiffs had a reasonable expectation of economic advantage that has been lost as a result of Defendants' improper, willful and malicious interference through their misappropriation of Plaintiffs' confidential trade secrets and infringement of Plaintiffs' trade marks.

157.    As a direct and proximate result of Defendants' interference, Plaintiffs have suffered substantial damages.

158.    Defendants' actions have been willful and outrageous and undertaken with reckless indifference to Plaintiffs' rights.  As a result, Plaintiffs seek damages in an amount to be proven at trial.

## AS AND FOR A TWELFTH CAUSE OF ACTION
(Common Law Fraud)
Against All Defendants

159.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

160.    The intentional acts alleged hereinabove on the part of Defendants constituted fraudulent conduct in that Defendants improperly utilized Plaintiffs' good will, reputation, financial and intellectual property, assets and other property in a manner intended to and which did fraudulently, surreptitiously and illegally divert and convert the aforesaid assets and property for their own benefit to the detriment and loss of Plaintiffs.

161.    In addition, Plaintiff Qi, continued to fund and invest in Harmonia and to devote her time, resources, good will and reputation to Harmonia, being lulled into believing that Defendants were acting in the best interests of her company, Harmonia, and carrying out their fiduciary duties of loyalty, due care and good faith when, in fact, they were conducting their

business on behalf of themselves in a furtive manner designed to mislead Plaintiff.  Had Plaintiff

Qi known the truth, she would not have invested in the projects they claimed to need funds for

and would not have allowed them to expend money from Harmonia's coffers and would not have

allowed them to remain in the positions of control from which they carried out their fraudulent

scheme.

162.    Defendants engaged in subterfuge and surreptitiously carried out their illegal

activity with the effect and intent of fraudulently concealing from Qi and Harmonia, Defendants'

conduct and true intentions, while having Plaintiffs pay the expenses of Defendants' preparatory

efforts to steal, convert and divert Plaintiffs' assets to their own, during which time Defendants

presented a false façade that their efforts were being done on behalf of Harmonia, to which they

owed the fiduciary duties of loyalty and due care.

163.    In addition to such affirmative and intentional fraudulent conduct, Defendants'

material omissions in carrying out their brazen swindle, constitutes fraud by omission which was

relied upon by Plaintiffs.  In the case of Plaintiff Qi, such fraudulent conduct in the face of her

providing to Defendants monetary and professional support, believing and relying upon the false

fact that they were conducting their business on behalf of her company, Harmonia and herself,

resulted in infliction of compensatory damages and, in the case of Plaintiff Qi, emotional distress

for which Plaintiffs seek damages herein in an amount to be proven at trial.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
#### (Civil Conspiracy)
#### Against All Defendants

164.    Plaintiffs repeat and reallege each and every one of the foregoing allegations as if

set forth fully and at length herein.

165.    As stated in detail above, the Defendants agreed, combined and acted with a

common plan and purpose to defraud, misappropriate and utilize Plaintiffs' trade secrets and trademarks by engaging in the unlawful acts described above.

166.    Defendants committed overt acts, as described above, including but not limited to, the unauthorized taking of proprietary information, trade secrets, and trademarks, in order to compete unfairly, against Plaintiffs.

167.    As a direct and proximate result of the acts done in furtherance of Defendants' conspiracy, Plaintiffs have been damaged, and will continue to suffer economic and reputational harm.

168.     Defendants' actions have been willful and outrageous and undertaken with reckless indifference to Plaintiffs' rights.

169.    As a result, Plaintiffs seek damages in an amount to be proven at trial.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
**(Injunctive Relief)**

170.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

171.    Harmonia seeks a permanent injunction enjoining Defendants from using the HARMONIA Mark in conjunction with any theatrical and/or intellectual properties, services, products or goods and otherwise infringing on Harmonia's Mark.

172.    In addition, Harmonia seeks an injunction to prevent Dingledine and Cao from competing with Harmonia, from violating their fiduciary duties, from, in the case of Dingledine, violating the express confidentiality provisions and the non-compete clause of his employment agreement with regard to Harmonia's intellectual properties, industry and investor contacts, and enjoining all Defendants from unfairly competing with Harmonia in the area of theatrical and musical production, performance, exhibiting, and licensing with respect to such properties and

productions.  Due to Dingledine's high level executive position with Harmonia he had access to all of its proprietary and confidential information.

173.    Defendants' unfair competition with Plaintiffs constitutes blatant conduct which is improper, deceptive, and unlawful and as set forth herein, has caused and continues to cause irreparable injury to Harmonia and Qi.

174.    The grounds for an injunction are present therein, including the fact that Plaintiffs have a likelihood of success on the merits; irreparable harm will be done if the injunction is denied; the balance of the equities is in favor of granting the injunction and Plaintiffs have been injured by Defendants' actions and will continue to be injured absent the requested injunctive relief.

**RELIEF REQUESTED**

**WHEREFORE,** Plaintiff respectfully requests this Court enter judgment against Defendants:

(a)   in the sum to be determined at trial, but believed to be in excess of ten million dollars ($10,000,000), together with interest thereon from the due dates thereof;

(b)  appropriate injunctive and equitable relief ordering: (i) restitution and/or disgorgement of all profits and revenues obtained by Defendants and (ii) enjoining Defendants from using the HARMONIA Mark in conjunction with any theatrical and/or intellectual properties, services, products or goods and from otherwise infringing on Harmonia's Mark; and (iii) an injunction, enjoining Defendants from competing with Harmonia, from violating their fiduciary duties, from, in the case of Dingledine, violating the express confidentiality provisions and the non-compete clause of his employment agreement with regard to Harmonia's intellectual properties, industry and investor contacts; and (iv) enjoining all Defendants from unfairly competing with Harmonia by prohibiting Defendants from engaging in the conduct of any business in the fields of theatrical

and musical production, performance, exhibition licensing, and/or broadcasting with respect to such theatrical and musical properties and productions.

(c)  an award to Plaintiffs of their costs and disbursements, together with attorneys' fees; and

(d)  such other and further relief as to the Court appears just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Date:  Montvale, New Jersey
       December 14, 2023

**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**

By: _/s/ Gary S. Graifman_____
     Gary S. Graifman, Esq.
     Daniel C. Edelman, Esq.
     16 Squadron Boulevard, Suite 106
     New City, New York 10956
     Tel. (845) 367-2570
     ggraifman@kgglaw.com
     dedelman@kgglaw.com

     *Attorneys for Plaintiffs*